In re Walter K. GUILLOT, Debtor.

Dwayne M. Murray, Trustee, Plaintiff,

v.

Walter K. Guillot, The Walter K. Guillot East Baton Rouge Property Trusts, Chester Burton Guillot, Steven Michael Guillot, and Kirk David Guillot, Individually and as Trustee of the Walter K. Guillot East Baton Rouge Property Trusts, Defendants.

Bankruptcy No. 97–11678.
Adversary No. 98–1050.

United States Bankruptcy Court,
M.D. Louisiana.

June 26, 2000.

Michael A. Crawford, Breazeale, Sachse & Wilson, Baton Rouge, LA, for plaintiff.

Dwayne M. Murray, Baton Rouge, LA, trustee.

Richard F. Zimmerman, Jr., Randall J. Robert, Kantrow, Spaht, Weaver & Blitzer, Baton Touge, LA, for Donald G. Reynolds.

Joseph R. Raggio, Rex English, Baton Rouge, LA, for defendants.

## *RULING*

LOUIS M. PHILLIPS, Bankruptcy Judge.

Before the court is a proceeding whereby a Chapter 7 trustee tries to lay claim to a piece of immovable (real) property title to which is purportedly held by a Louisiana trust. The trust was established by the debtor some seven (7) years before this bankruptcy case by means of an act of donation whereby the debtor purported to donate his Louisiana residence to the trust(s) established within the act to accept the donation. Title to the Tennessee property was obtained with the proceeds of the sale, purportedly by the trust, of the Louisiana residence, some months after the filing of the bankruptcy petition and only days before the purchase of the Tennessee property. We say "purportedly" so many times because the trustee alleges that the trust never obtained title to the Louisiana residence, because the original act of donation was without legal effect.

We conclude that the validity of the original donation of the Louisiana residence into the trust is dependent upon whether Walter K. Guillot (Guillot), debtor herein, intended, at the time of the act of donation, to divest himself irrevocably as is required by the Louisiana Civil Code.[1] If Guillot had such intent, the donated property was property of the Trust as of the commencement of Guillot's bankruptcy case, and the Tennessee property evades the Chapter 7 trustee. If not, the putative donation was an absolute nullity under Louisiana law, and the Louisiana property was subject to the hypothetical ideal lien granted to the trustee, as of the commencement of the case, by 11 U.S.C. § 544(a).[2] If the Louisiana property was subject to the § 544(a) ideal lien powers and rights, the post-bankruptcy transfer of the Louisiana property, which resulted in the purchase by the Trust of the replacement Tennessee property, did not cleanse the lien, which ultimately (and presently) encumbers the Tennessee property.

Upon the following findings of fact and legal analysis, we find that under the applicable Louisiana state law, the act of donation was invalid and therefore had no legal effect. We further conclude that the bankruptcy trustee retains the ideal lien upon the Tennessee property, and finally, that this declaration requires that the interest(s) of the state law trust(s) in the Tennessee property are subordinated to the right of the bankruptcy trustee, as representative of the bankruptcy estate, to administer the Tennessee property for the benefit of creditors of this estate.

## I. INTRODUCTION; PROCEDURAL POSTURE OF ADVERSARY PROCEEDING

This adversary proceeding is brought by the bankruptcy trustee of the captioned bankruptcy estate and Donald G. Reynolds, creditor of the debtor and holder of a judgment of this Court excepting a pre-bankruptcy state court judgment against the debtor, in excess of $255,000, from

---

1. **Art. 1468. Donation inter vivos, definition**

 A donation *inter vivos* (between living persons) is an act by which the donor divests himself, at present and irrevocably, of the thing given, in favor of the donee who accepts it.
 LA.CIV.CODE ANN. art. 1468 (West 2000).

2. Citations to "11 U.S.C. § ____" will hereafter be indicated as " § ____". This Court has original jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 1334(b) and 157(a) (West 1993). Pursuant to 28 U.S.C. § 157(b)(2)(A) (West 1993), this is a proceeding over which the court has authority to issue a final order.

discharge. This complaint seeks injunctive and declaratory relief.

Generally, the complaint alleges that a number of years prior to the August 6, 1997 bankruptcy petition date, the debtor, Guillot, purported to donate his Louisiana residence to a trust, established by the Act of Donation and the acceptance of the trustee. Immediately prior to the donation, the debtor placed a mortgage upon the property, in the principal amount of $200,000. Though the mortgage was properly recorded in the public records, the complaint alleges that at the time of the mortgage it was agreed (by the debtor and mortgagee) that the mortgage would not attach to the residence. The complaint alleges that the purported transfer of the property into the trust was a sham, known as an absolute simulation under Louisiana law. Though the Trust was record owner of the residence as of the filing of the bankruptcy petition, the bankruptcy trustee alleges that the debtor was the true owner, and, as well, the holder of the right to obtain judicial recognition of the nullity of the pre-petition transaction.[3] Further, the complaint alleges that Reynolds, an unsecured creditor of Guillot, could also have attached the donation and established an interest in, to, and upon the property prior to bankruptcy.

The complaint alleges that some eight months after the bankruptcy case was filed the Louisiana residence was sold, and the proceeds of the sale were used to purchase a replacement residence for the debtor in Tennessee, with legal title to be held by the trust. The complaint requests that this Court grant injunctive relief in the nature of a prohibitory injunction forbidding the transfer or encumbrance of the Tennessee residence pending the outcome of this proceeding and thereafter. Second, it requests the issuance of a declaratory judgment declaring the Tennessee proper-

ty to be property of the bankruptcy estate and ordering the record transfer of the property to the estate of the debtor.

This Court issued a Temporary Restraining Order. After hearing within 10 days, a consent preliminary injunction prohibiting the transfer of the Tennessee property or the encumbering thereof to the prejudice of the trustee was entered.

Before the Court is the request for permanent injunction and final declaratory relief, to be supported by further order, if necessary, to effect formal (record) return of the Tennessee property to the trustee.

## II. THE TIMELINE

On June 6, 1989 Donald Gene Reynolds (Reynolds) agreed to purchase WKG–TV Video Electronic College, Inc. (WKG) for $100,000 from Guillot and WKG's minority shareholder. The purchase agreement placed several requirements on WKG, chief among them to secure regulatory approval of the new school. WKG failed to effect the regulatory approval and, instead, requested additional funds from Reynolds. Reynolds refused. WKG "voided" the contract and sued Reynolds for breach of contract and other relief in Louisiana State Court on December 5, 1989. Reynolds answered the suit and reconvened[4] for tortious interference with contract on January 4, 1990. As the suit progressed, Reynolds learned that WKG's shareholders had secretly confected the sale of WKG for $205,000 to another party. On July 23, 1990, Reynolds amended his reconventional demand to include this damages based upon secret sale. Subsequently, a trial date was fixed in the State Court litigation, for November 7, 1991.

On September 6, 1990, Guillot granted a supposed collateral mortgage on his Louisiana residence (and another tract of immovable property) to Guaranty Bank (the Bank), to secure the payment of a collater-

---

**3.** Notwithstanding this interest in the property, there was no reference to the debtor having such an interest disclosed within the debtor's schedules or statements.

**4.** This is the Louisiana state procedural version of the federal counterclaim. *See,* Code Civ.Proc. Arts. 1061–1067.

al mortgage note in the principal amount of $200,000, payable on demand, with interest at the rate of 12.0% per annum. The collateral mortgage note was pledged to the bank to secure the indebtedness of Guillot, and perhaps others.[5]

On September 15, 1990, Guillot had the law firm representing him in the litigation establish a Trust (or series of Trusts) through the execution of an "irrevocable donation" by which Guillot purported to donate his Louisiana residence to the Trust, of which his three children were beneficiaries. Brian J. Prendergast, the attorney representing Guillot in the state court litigation, was appointed trustee, and accepted the appointment. The "Trust" was not recorded until March 18, 1991.

On September 24, 1990, the bank wrote Guillot a letter. The letter states as follows: "These two pieces of collateral are presently securing all debt with Guaranty Bank ... that your name is on either corporate or individual. This letter is our agreement with you that the property identified ... as your personal residence will not be held as security for any corporate debt, specifically WKG–TV Video Electronic College, Inc., or K & L Educational Enterprises, Inc. It is further agreed that we will release that particular piece of collateral under an act of partial release whenever you desire." (Exh. D–1). There was no evidence introduced that suggested that this agreement was confected at a time other than the time of confection of the mortgage, so we find, notwithstanding the date of the letter, that the bank's agreement to release the residence was reached contemporaneously with the execution of the mortgage.

Guillot lost to Reynolds at trial and was cast in judgment for the principal sum of $255,000 on November 8, 1991.

Notwithstanding the aforementioned letter from Guaranty Bank, there was some litigation, subsequently, involving the successor to Guaranty Bank (Regions Bank), Guillot and the trust, in connection with the property subject to the mortgage.[6] An agreement entitled "Receipt and Release," was executed by Regions Bank, Guillot, and the trust, respectively, on October 26, 23, and 24, 1995. By the Receipt and Release, Regions Bank agreed to accept $50,000 in full satisfaction of any and all claims in, to, and in relation to the collateral mortgage, and (apparently) returned the collateral mortgage note marked "Paid," so that the mortgage could be erased from the public records as an encumbrance upon the Louisiana residence and the other property affected.

Guillot never made a payment to Reynolds under the judgment and filed a chapter 7 bankruptcy petition on August 6, 1997. Reynolds' judgment against Guillot was subsequently declared nondischargeable by this Court. The Trust, the donation, the possibility of revoking the donation, etc. were not disclosed in the bankruptcy case. As of the date of the bankruptcy petition, the mortgage was of record in the public records of the Parish of East Baton Rouge, State of Louisiana,

---

**5.** The collateral mortgage upon immovable (real) property involves the execution of a collateral mortgage note to "ourselves," "myself," or "bearer," which is paraphed *ne varietur* with the act of collateral mortgage. The note is endorsed and pledged to the mortgagee, to secure indebtedness as provided for in the pledge agreement. The mortgage, therefore, secures the payment of the collateral mortgage note held in pledge, which secured the actual indebtedness (evidenced, for example, by debt instruments commonly referred to as "hand notes"). From the face of the public records, this mortgage appeared to be a $200,000 encumbrance upon the Louisiana

residence, from the date of its recordation, September 6, 1990. The pledge agreement, which typically identifies the parties whose debts are secured by the pledged mortgage note, and thus the collateral mortgage, was not introduced into evidence.

**6.** We know that the litigation involved the mortgage and mortgage note. The evidence did not establish whether the litigation was over whether the letter from Guaranty Bank was enforceable or whether there were disagreements about the other tract of land encumbered by the mortgage.

appearing as a valid encumbrance upon the Baton Rouge residence.

In early 1998, some months after the bankruptcy petition, Guillot marketed the Louisiana residence purportedly held in trust, for sale. By act entitled "Resignation of Trustee and Appointment of Subsequent Trustee," dated March 9, 1998, Prendergast resigned as trustee. Notwithstanding the title of the act, there was no appointment of subsequent trustee within the act. By act dated March 10, 1998, and entitled, "Appointment of Trustee for the Walter K. Guillot East Baton Rouge Property Trusts," Walter K. Guillot, in his capacity as settlor, appointed Guillot's son—and Trust beneficiary—Kirk David Guillot as trustee.

On March 26, 1998, an Act of Cash Sale was signed by the new trustee, Kirk David Guillot, selling the Louisiana residence for a cash purchase price of $182,000. This Act of Cash Sale was recorded in the public records on March 30, 1998.

On March 27, 1998 the Trust purchased a piece of real property in Mt. Juliet, Tennessee with the proceeds from the sale of the Louisiana residence, for a cash purchase price of some $166,000. By act dated April 14, 1998, and entitled "Request for Cancellation of Mortgage," the collateral mortgage note (marked "paid") was presented to the Clerk of Court and Recorder of Mortgages for the Parish of East Baton Rouge, State of Louisiana. The mortgage was cancelled by the Office of the Clerk of Court on April 15, 1998.

The trustee and Reynolds argue that the donation was an absolute simulation under Louisiana law, was therefore a nullity, and should be avoided pursuant to § 544(b)[7]. Because a simulation, under Louisiana Law, has no effect upon the creditors of the donor, who can look to the property and avoid the purported transfer, and because Reynolds, as an unsecured creditor, could have avoided the transfer under Louisiana law, it is argued by plaintiffs that § 544(b) is the applicable provision. Alternatively, the plaintiffs argue that there never was a donation, because the donation was a simulation, that the Louisiana property was simply property of the estate as of the filing of the case, and that the Tennessee property, acquired with estate funds (the proceeds of estate property under § 541(a)(6)[8]) was property acquired by the estate and therefore estate property under § 541(a)(7).[9]

Guillot and the Guillot trustee answer that he created the Trust to keep the real (immovable) property separate from his soon to be wife, having experienced previous community property partitions (in connection with prior divorces) that caused

7. § 544(b) reads:

b) (1) Except as provided in paragraph (2), the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.

(2) Paragraph (1) shall not apply to a transfer of a charitable contribution (as that term is defined in section 548(d)(3)) that is not covered under section 548(a)(1)(B), by reason of section 548(a)(2). Any claim by any person to recover a transferred contribution described in the preceding sentence under Federal or State law in a Federal or State court shall be preempted by the commencement of the case.

11 U.S.C.A. § 544(b) (West 2000).

8. 11 U.S.C. § 541(a)(6) reads as follows:

**§ 541. Property of the estate**
(a) The commencement of a case under section 301, 302, or 303 of this title creates an estate. Such estate is comprised of all the following property, wherever located and by whomever held:

. . .

(6) Proceeds, product, offspring, rents, or profits of or from property of the estate, except such as are earnings from services performed by an individual debtor after the commencement of the case.

9. 11 U.S.C. § 541(a)(7) reads as follows:

. . .

(7) Any interest in property that the estate acquires after the commencement of the case.

him to take precautions against this real (immovable) property becoming community property within his upcoming matrimonial regime. Further, Guillot and the trustee argue that there is no direct evidence that Guillot transferred the home to evade his creditors. Additionally, says Guillot, the facts support the donation in that Guillot "made sure any substantial matters [relating to the property] were passed through the trustee." Merely because the beneficiaries acceded to Guillot's requests, says Guillot, does not prove that the transaction was a simulation.

## III. ANALYSIS

### LOUISIANA LAW ON THE VALIDITY OF THE DONATION TO THE TRUST

■ Our introductory analysis concerns the state law question, whether the purported donation, under Louisiana law, was valid, or whether state law would conclude that the donation is attackable (under some law, by someone) as a sham transaction. If the donation was valid and not subject to attack from any perspective, the estate's claim is resolved against the bankruptcy trustee. It is only after resolution of the state law question that bankruptcy law becomes applicable.

All parties have approached this litigation as being over whether the purported donation was an absolute simulation under Louisiana Civil Code 2026.[10] Plaintiffs assume that the simulation article applies to donations, and further, assume that the Louisiana presumption contained in Article 2480, which creates a presumption of simulation if the seller remains in possession, is equally applicable to a donation.[11] This assumption operates upon the premise, correctly held, that the avoidance by means of attacking the donation as a fraudulent transfer under § 548 of the Code and the incorporation of the Louisiana revocatory action[12] by means of § 544(b), are not available. Because the purported donation took place some seven (7) years prior to bankruptcy, the § 548 reach-back period (one year) and the revocatory action preemption period (three years)[13] protect the donation from attack under these particular causes of action. Plaintiffs have determined, then, that it is necessary to attack the validity of the donation under state law, to establish that in fact no transfer ever took place.

This Court is concerned, however, with the question whether the action in declaration of simulation is in fact applicable to an act of donation. The law of Louisiana provides for another type of simulation, the "relative simulation."[14] According to

10. LA.CIV.CODE art.2026 establishes the absolute simulation. It reads:
A simulation is absolute when the parties intend that their contract shall produce no effects between them. That simulation, therefore, can have no effects between the parties.

11. Article 2480 reads as follows:
Art. 2480. Retention of possession by seller, presumption of simulation
When the thing sold remains in the corporeal possession of the seller the sale is presumed to be a simulation, and, where the interest of heirs and creditors of the seller is concerned, the parties must show that their contract is not a simulation.

12. Generally the Louisiana revocatory action is the applicable non-bankruptcy law avoidance power to be used within Louisiana bankruptcy cases through § 544(b), if the criteria of § 544(b) are met. Louisiana Civil Code Article 2036 establishes the revocatory action.

It reads as follows: "An obligee has a right to annul an act of the obligor, or the result of a failure to act of the obligor, made or effected after the right of the obligee arose, that causes or increases the obligor's insolvency."

13. LA.CIV.CODE art.2041 reads as follows:
Art.2041. Action must be brought within one year
The action of the obligee must be brought within one year from the time he learned or should have learned of the act, or the result of the failure to act, of the obligor that the obligee seeks to annul, but never after three years from the date of that act or result.

14. LA.CIV.CODE art.2027 reads as follows:
Art.2027. Relative simulation
A simulation is relative when the parties intend that their contract shall produce effects between them though different from those recited in their contract. A relative

Louisiana Revision Comments to Civil Code Article 2027, and the interpretive jurisprudence, the absolute simulation is to be distinguished from the sham sale, or disguised donation, by which parties appear to contract for a sale of property when donation of the property is the real intent of the parties. The disguised donation is one of the examples of a relative simulation.[15]

Notwithstanding the consensus of the parties, we are concerned that the absolute simulation is not applicable to the act of donation. Our first concern is that the absolute simulation relates to contracts, is found in Title IV (Of the Different Modes of Acquiring the Ownership of Things) of Book III of the Civil Code (Conventional Obligations and Contracts). The law of donations is found in Title II (Donations) of Book III.

According to Professor Litvinoff, the donation "is a special kind of gratuitous contract called a liberality since it causes a depletion of the donor's patrimony...."[16] A gratuitous contract is a recognized type of contract under Louisiana law, within Title IV of Book III of the Louisiana Civil Code.[17] The simulation articles are not limited in the references to contracts.[18] Therefore, the Louisiana Civil Code does not preclude the application of the simulation articles to a donation. Likewise,

the donation articles do not preclude the incorporation of the simulation articles. Simply, a donation is a type of contract; a contract is a simulation if the parties lack the intent expressed in the contract. Perhaps, then, a donation can be a simulation.

■ However, there are conceptual problems that arise when attempting to make the law of simulation applicable to donations. The most apparent of them is in attempting to apply the presumption established by Civil Code Article 2480 to an act of donation. According to Professor Litvinoff, the presumption established by Article 2480 is not only triggered when a purported vendor of immovable property maintains continued physical possession of the property subject to the act of sale, but, as well, is triggered "in all cases where the thing sold remains in the possession of the seller because he has reserved to himself the usufruct, or retains possession by a precarious title."[19] However, while the donation articles do particularly provide that "no feigned delivery of immovables given shall have effect against third parties,"[20] a donation can stipulate that the donor reserves the right of "disposing of any object comprised in the donation,"[21] can expressly allow for the retention of the "enjoyment or usufruct of the immovable

---

simulation produces between the parties the effects they intended if all requirements for those effects have been met.

15. La.Civ.Code Art.2027—Revisions Comments (a) and (b)—1984

(a) This Article is new. It does not change the law, however. It expresses a principle contained in C.C. Art. 2464 and 1900 (1870). A relative simulation takes place when the parties make an apparent sale while actually intending a donation.

(b) Under this Article, a simulated sale may be a valid donation if the requirements of form have been met. See C.C. Art. 1536 (1870); *McWilliams v. McWilliams*, 39 La. Ann. 924, 3 So. 62 (1887).

16. Litvinoff, *The Law of Obligations,* Part I, p. 369.

17. La.Civ.Code Art.1910 reads as follows:

**Art.1910. Gratuitous contracts**
A contract is gratuitous when one party obligates himself towards another for the benefit of the latter, without obtaining any advantage in return.

18. La.Civil Code Art.2025 is the general article defining a simulation. It reads as follows:

**Art.2025. Definition; simulation and counterletter**

. . .

If the true intent of the parties is expressed in a separate writing, that writing is a counterletter.

19. *Id.* at 418.

20. LA.CIV.CODE art. 1537.

21. LA.CIV.CODE art. 1531.

property given"[22] and can even "stipulate the right of return of objects given, either in case of his surviving the donee alone, or in case of his surviving the donee and his descendants."[23] Therefore, the marks of a simulation, grafted together to effect a state law presumption of simulation, are expressly allowed by the Civil Code within valid acts of donation. Because the Civil Code expressly provides for these types of reservations, the reservation of a usufruct, for example, cannot be the hallmark of a sham donation (the declaration of which would nullify the transfer), as it would be of a sham sale (the declaration of which would adjudge the transfer to be a donation if the act was in proper form).

We notice that the presumption of Article 2480 arises in favor of heirs and creditors of the seller. Because of this we know that the reservation of usufruct, for example, if the presumption is not rebutted, will result in the finding (most probably) of a relative simulation if the act is in proper form. A relative simulation, or disguised donation, if declared, would result in the recognition of rights of creditors by means of the revocatory action, if the donation caused or increased the donor's insolvency,[24] and would result, perhaps, in heirs obtaining rights within the right (within Louisiana succession law) of collation.[25]

■ So, while the presumption applies to the absolute simulation, we think it more often employed to expose a disguised donation, for the benefit of heirs or creditors of the donor. A donation with reservation of usufruct cannot be challenged by means of the presumption designed to impose upon the donor (and donee) the obligation of establishing that a purported sale is not a disguised donation. Because the presumption applies to both absolute and relative simulations, with the goal of attacking a relative simulation being to prove that the act of sale was in fact a donation, we do not see how the presumption can be used within the context of an attack upon an act of donation.

Another concern is that we have been unable to find a reported decision of the Louisiana courts that has applied the absolute simulation article to a donation, or, put another way, that has declared an act of donation to be an absolute nullity **as an absolute simulation.**

However, though we are concerned about the applicability of the absolute simulation article and jurisprudence to the donation, Louisiana jurisprudence has established that an act of donation, in valid form can, notwithstanding the facial validity, be attacked as a nullity under the articles of the Civil Code dealing with donations, and nullity. Probably because of the focus of the parties upon the question of whether the act of donation was a simulation, this jurisprudence was not provided in either pre- or post-trial brief. Because the caselaw that deals with the invalidity of a form-wise valid act of donation does not employ the presumption afforded by Civil Code Article 2480, we have determined to approach the question of the validity of the donation without the use of the state law presumption, imposing upon the trustee both the burden of moving forward and the burden of proof.

In Louisiana, a donation *inter vivos* is defined as "an act by which the donor [while alive] divests himself, at present and irrevocably, of the thing given, in favor of

22. La.Civ.Code art. 1533.

23. La.Civ.Code art. 1534.

24. La.Civil Code Art.2036 reads as follows:
 **Art.2036. Act of the obligor that causes or increases his insolvency**
 An obligee has a right to annul an act of the obligor, or the result of a failure to act of the obligor, made or effected after the right of the obligee arose, that causes or increases the obligor's insolvency.

25. La.Civil Code Art. 1227, et seq. We offer no explanation of collation; it is both hard and irrelevant to our inquiry.

the donee who accepts it." [26] For a federal court, determining state law under our *Erie*[27] charge, the case *Anderson v. Aetna Life & Casualty* is determinative.[28] Joel H. Anderson (Anderson) was trustee for the Joel Gregory and Lisa McCall Anderson Trusts (Trusts). The beneficiaries were his two children and the creator of the Trust was his mother-in-law. Anderson was named trustee. In 1974 Anderson and his wife purported to donate their personal residence to the Trust. Anderson, operating as trustee of the trust, later conveyed the property back to him and his wife, and thereafter encumbered the property with several mortgages. Anderson subsequently experienced financial difficulties. To forestall foreclosure by the lienholders, the Andersons filed suit against the lienholders alleging that the transfer from the Trust to the Andersons, personally, was a sham because the consideration was never paid, and that the liens were, therefore, nonexistent.[29]

The court ruled against the Andersons, essentially adopting their reasoning, but moving it backward a step to the original transaction whereby the immovable property was originally "donated" to the trust. The court held that the donation of the

residence to the trust was invalid because the Andersons "never had the requisite donative intent to irrevocably divest themselves of the house," [30] as is required by Article 1468. According to the court, "it must appear that the donor had the intent to divest himself of his property. This intent is an invisible thing existing only in the donor's mind...." [31] While intent was normally to be inferred from the authentic act, the court noted that the Louisiana parole evidence rule was evidentiary in nature (as opposed to substantive) and could be waived if not objected to at trial.[32] The *Anderson* court refers at some length about the "much parole and extrinsic evidence ... presented at trial ..." [33] as establishing the factual basis for the conclusion that the original donation was invalid.

The court found numerous factors indicating a lack of donative intent. The Andersons continued to live in the house, did not pay rent, and "did not cease to enjoy the benefits of home ownership after the date of the alleged donation." [34] According to the trial court, the Andersons personally paid property taxes, insurance, utilities, and repairs for the house; that they personally contracted for and spent

26. LA.CIV.CODE ANN. art. 1468 (West 2000).

27. *See, Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *F.D.I.C. v. Abraham*, 137 F.3d 264 (5th Cir. 1998).

28. 535 So.2d 1070 (La.Ct.App. 2nd Cir.1988).

29. *Id.* at 1070–72.

30. *Id.* at 1072.

31. *Id.* at 1073.

32. *Id.* at 1073.

33. *Id.* The *Anderson* court, recall, was dealing with a claim by a transferee of a purported sale (i.e., a party to the transaction) seeking a declaration that the purported sale was a nullity. Likely, the other party to the sale, the trust, of which Mr. Anderson was trustee, would not have objected to the use of parole evidence. The question in *Anderson* is therefore, as regards the second transaction, backwards from what we have here (the creditor arguing the validity of the transaction; the parties arguing its shamness). The opinion does not tell us just how the issue about the original act of donation of the house into the trust was raised by the creditors (who would somehow have argued that the second transfer was good, or, if it was not, then the first transfer was a sham so that title was never properly transferred to the trust). We think that the *Anderson* court's reference to the parole evidence rule was limited to the original petition, and the question of the validity of the secured transfer. Had the creditor initiated an attack upon the first transfer (they probably never would have given the need. Given the second transfer which transferred title to the Andersons from the trust), we do not think the parole evidence rule would have been applicable (see discussion, *infra* ).

34. *Id.*

$120,000 renovating the house; that they "personally made all installment payments on the notes and mortgages affecting the property, listed themselves as the insureds on their homeowners' policies, claimed interest payments on loans as deductions on their personal income tax returns and listed the home as a personal asset on financial statements." [35]

The Andersons' stated motive for donating the house—"a simple way to convey to the children 'something we could give them in the future'"—also militated against a finding of *present* intent to donate, according to the court. [36]

The *Anderson* court discusses an earlier case that is also instructive. Prior to her death, the decedent in *Succession of Simpson* [37] donated her house to certain of her children. While the intent to donate was to be inferred from the authentic act, the court concluded that "although Mrs. Simpson may have had the intent to donate, she did not intend to divest herself of her home until her death." [38] The court arrived at this conclusion based on two factors. First, Mrs. Simpson never gave up possession of her home. Second, a letter written by Mrs. Simpson to all of her children established that the motive behind the donation was to punish certain of the children for not assisting or cooper-

ating in the sale of the house. From the motive and the fact that Mrs. Simpson never moved out of the house, the court inferred that Mrs. Simpson really intended a donation *mortis causa*—that she did not intend to divest herself of the property until her death. [39]

According to the *Anderson* court, in response to critical scholarship that had argued that the *Simpson* donation was really a donation *inter vivos* subject to a suspensive condition (the donor dying), the notion that Mrs. Simpson could effect a donation *inter vivos* subject to the condition of her dying, "goes directly against the very definition of a donation *inter vivos* which requires present divestment of ownership and does not provide for continued use and enjoyment." [40]

The *Anderson* court also notes that the "instrument creating the trusts provided that neither the parents of the beneficiaries nor the settlor of the trusts could enjoy a usufruct over any property donated to the trusts." [41]

Against the backdrop of the Code articles on donations, particularly Article 1533, [42] the *Anderson* court concludes that the facts elicited at trial established that the trial court was not clearly erroneous in concluding that there was never a donation of the property to the trust.

35. *Id.* at 1072.

36. *Id.* at 1073.

37. 311 So.2d 67 (La.Ct.App. 2nd Cir.1975),

38. *Id.* at 73.

39. *Id.*

40. *Anderson*, 535 So.2d at 1074.

41. *Id.* at 1074. The actual language of the instrument is not related by the court. We don't quite understand this language, in light of the quotation from the opinion noted at footnote 43, particularly, "although the Andersons, in their purported act of donation, did not formally reserve a usufruct ..." How they could have if the trust instrument said they couldn't is unclear. Perhaps such language would have been binding upon the

trustee in a subsequent action by the beneficiaries claiming that the trust should not have accepted such a donation; perhaps, because Mrs. Anderson was the trustee, the provision was designed to preclude the trustee from acting personally with trust property. We mention this because we think the reasoning of the court—acting like one has retained a usufruct when a usufruct has not been reserved is a ground upon which to question the validity of the donation—is correct; we question this incongruity because we noticed it.

42. La.Civil Code Art. 1533 reads as follows:

**Art. 1533. Donation or reservation of usufruct**
The donor is permitted to reserve for his own advantage, or to dispose of for the advantage of any other person, the enjoyment or usufruct of the immovable property given.

Although the Andersons, in their purported Act of Donation, did not formally reserve a usufruct over the house, they clearly contained the use and enjoyment of the property to the same extent as if a usufruct had been reserved and as though no donation had been made.[43]

■ What the *Anderson* court is saying (we think) is that the present intent irrevocably to divest must exist. Because reservation of a usufruct is expressly provided for within Article 1533, if the donation is in fact a donation with reservation of usufruct, the usufruct must be reserved. This comports with Louisiana law on the establishment of usufruct. The usufruct "is a real right of limited duration on the property of another."[44] Regarding immovable property, which is considered (for usufruct purposes) a non-consumable thing,[45] the usufructuary "has the right to possess them and to derive the utility, profits and advantages that they may produce under the obligation of preserving their substance."[46] The usufruct can be established "by a judicial act either *inter vivos* or *mortis causa*, or by operation of law."[47] These methods of acquiring a usufruct (juridical act or operation of law) are, expressly, the only two means by which a usufruct can be acquired (though we assume that implicit in the nature of the right or thing that is the usufruct is the

ability to acquire a usufruct by acquisitive prescription.)[48]

■ The continued retention of the use and enjoyment of the donated property, without the reservation of usufruct, undercuts the suggestion of intention of the purported donor to divest himself irrevocably of his ownership, when the usufruct could have been reserved to accomplish the continued possession, use, etc., subject to the Civil Code articles on usufruct.

This makes sense to us. Unlike the absolute simulation, which would presume relative simulation even if the usufruct was reserved, the "reservation," by behavior (only), of the same rights that could (only) be reserved legally by juridical act in connection with a valid act of donation is antithetical to the notion of intention to divest. If you wanted to do a donation and reserve the usufruct, why didn't you do it? In refusing to reserve the usufruct while maintaining possession, control, use, etc., doubt is thrown upon the validity of the donation.

The *Anderson* and *Simpson* opinions are the only two Louisiana decisions we have found that address the question whether an of donation can be adjudged invalid solely for want of donative intent, as opposed to being found null upon one of the particular grounds of nullity contained within Louisiana law.[49] Neither mentions the simulation articles.[50]

---

43. *Id.*

44. La.Civ.Code art. 535.

45. La.Civ.Code art. 537.

46. La.Civ.Code art. 539.

47. La.Civ.Code art. 544.

48. *See*, Revision Comment Art. 544, 1984.

49. Particular provisions of the Civil Code establish that an act of donation of an immovable can be found null for want of form. La.Civ.Code Art. 1536. Also, the donation can be adjudged null due to want of capacity to receive the donation (La.Civ.Code Art. 1475), due to fraud on the donor (La.Civ.Code Art. 1478), due to undue influence exerted upon the donor (La.Civ.Code Art. 1479), be-

cause the donation is of property yet to come, as opposed to present property of the donor (La.Civ.Code Art. 1528), if the donation by its terms depends on the sole will of the donor (La.Civ.Code Art. 1529), or if the donation is conditioned upon payment of future or unexpressed debts or charges (La.Civ.Code Art. 1530).

50. We mention here another case, *Houghton v. Houghton*, 165 La. 1019, 116 So. 493 (La. 1928). In this case the Louisiana Supreme Court dealt with a series of transactions attacked by heirs of the purported transferor, by which the transferor had attempted to disinherit legal heirs. Among the transactions was an act of donation of a tract of immovable property (that was subsequently made the subject of a purported sale). The state Supreme Court resolves the unraveling of the

Our next question, because of the lack of mention of the simulation articles, concerns the legal consequences that flow from a finding that the donation is invalid. Because the donation occurred some seven (7) years before bankruptcy and because Louisiana law provides different prescription periods, depending upon the nature of the invalidity, we must determine whether the type of invalidity, or nullity found in the *Anderson* opinion was a relative or absolute nullity under Louisiana law.

▆▆▆ The *Anderson* case expressly affirms the holding of the trial court, "that the Andersons' lack of present donative intent at the time they exceeded (sic) the act of donation rendered null the purported donation inter vivos." [51] The law dealing with the "nullity" of contracts is found in Louisiana Civil Code Articles 2029–2035, and must be mentioned because of the distinction between types of nullity under Louisiana law. Article 2029, the general provision, establishes that "a contract is null when the requirements for its formation have not been met." However, the legal consequences of a determination of nullity depend upon whether the nullity is an absolute nullity under Article 2030 [52] or a relative nullity under Article 2031. [53] The basic difference with which we are concerned is the limitations period within which an action must be brought. According to Civil Code Article 2032, an action to declare an absolute nullity does not prescribe, but an action to annul a relatively

null contract "must be brought within five years from the time the ground for nullity has ceased, as in the case of incapacity or duress, or was discovered, as the case of error or fraud." [54]

The designation of the invalid donation as a "nullity," without more, does not expressly elucidate the opinion of the *Anderson* court as to what type of nullity it was adjudging the invalid act of donation to be.

We are satisfied, however, that the adjudication of invalidity was a declaration that the act of donation was an absolute nullity. We glean nothing from the opinion that suggests the act of donation into the trust was in improper form. None of the particular grounds of relative nullity (fraud, duress, lack of capacity, etc.), mentioned in the Civil Code is mentioned as a basis of the court's conclusion. The *Anderson* court affirmed the finding that the act of donation did not reflect the intent of the parties, and that the true intent of the parties was that there be no donation, or, put another way, that the juridical act was to have no effect. As such, the invalidity of the *Anderson* donation mimicked the definition of an absolute simulation. We cannot help but notice the similarities in the nature of the declarations (absolute simulation; invalid donation), and believe it appropriate to graft Louisiana jurisprudence dealing with the type of nullity resulting from a declaration that an act is an

---

acts of sale through the mechanism of the absolute simulation, but "avoids" the invalid donation because the articles on donation had not been complied with.

**51.** *Anderson,* 535 So.2d at 1073.

**52.** La.Civ.Code Art.2030 reads as follows:
 **Art.2030. Absolute nullity of contracts**
 A contract is absolutely null when it violates a rule of public order, as when the object of a contract is illicit or immoral. A contract that is absolutely null may not be confirmed.
 Absolute nullity may be invoked by any person or may be declared by the court on its own initiative,

**53.** La.Civ.Code Art.2031 reads as follows:
 **Art.2031. Relative nullity of contracts**
 A contract is relatively null when it violates a rule intended for the protection of private parties, as when a party lacked capacity or did not give free consent at the time the contract was made. A contract that is only relatively null may be confirmed.
 Relative nullity may be invoked only by those persons for whose interest the ground for nullity was established, and may not be declared by the court on its own initiative.

**54.** La.Civ.Code. Art.2032.

absolute simulation onto our analysis regarding the invalid donation.

Louisiana jurisprudence is consistent; an absolute simulation is an absolute nullity.[55] As an absolute nullity, the action to declare a simulation is imprescriptible.[56] Given the nature of the invalidity determined by the *Anderson* court, we conclude that even if an act of donation is not amenable to the action to declare an absolute simulation, it is a donation that is a nullity because of the absence of donative intent, and therefore is an absolute nullity. As such, the action to declare the nullity of the act of donation for lack of donative intent is imprescriptible.[57]

To conclude the nullity foray, we point out that the Louisiana Civil Code does not connect the action to declare an absolute simulation with a particular presumption period. The law concerning the imprescriptibility is jurisprudence which applies the general articles of absolute nullity and the imprescriptibility of the right to a declaration of absolute nullity, to the absolute simulation, because of what an absolute simulation is. The invalidity (and therefore nullity) of the action of donation, grounded in absence of donative intent, is nullity of the same nature and effect as the absolute simulation. The caselaw establishing that an absolute simulation is an absolute nullity, therefore, controls here.

We conclude that Louisiana law provides that an act of donation can be challenged as an absolute nullity, though we do not ground this cause of action upon the Civil Code articles on simulation and the attendant presumption that can be used to obtain a declaration that a purported transfer is a simulation.

## APPLICATION OF FACTS TO LOUISIANA LAW

■ In applying the facts of our case to the Louisiana Second Circuit jurisprudence, we find that Guillot lacked the requisite donative intent to divest himself of his residence.

We begin with the finding that Guillot *never* voluntarily relinquished either possession of, or control over, the home. This conclusion is reaffirmed at every turn, but we mention it now because it pervades.

The continued retention of possession, use, and control are illustrated by the hopeless mishmash of documents purportedly dealing with the "lease" of the property from the trust to Guillot. The record reveals that while a document purporting to be a lease was confected, it is of dubious viability. The lease purports to have been executed on October 17, 1990, the same day of the donation creating the Trust. But the date line is part of the notary signature block and is not signed by the notary. Further, the term of the lease begins August 1, 1991, almost a year after the property was donated. The amount of the lease itself is $350 per month (the house was sold in 1998 for $182,000) but was not due until the end of the lease, July 31, 1994. Against this backdrop we note that there was also a document purporting to waive the lease payment obligation. The waiver, which is undated and has no signature on the notary line, purports to forgive the unpaid lump-sum after the expiration of the lease. There is no renewal of the lease covering the time period between 1994 and the day in 1998 that the property was sold. There is an addendum to the lease that requires Guillot to "continue to maintain all insurance, pay all taxes, provide lawn care, etc. . . . ." The ad-

---

**55.** *See, Houghton v. Houghton,* 165 La. 1019, 116 So. 493 (La.1928); *Smelley v. Ricks,* 174 La. 734, 141 So. 445 (La.1932); *Spiers v. Davidson,* 233 La. 239, 96 So.2d 502 (La. 1957); *Kinney v. Kinney,* 150 So.2d 671 (La. App. 3rd Cir.1963).

**56.** La.Civ.Code Art.2032.

**57.** We realize that the parties assume that the simulation articles are applicable, and therefore that the caselaw on absolute simulation as absolute nullity is applicable. Because the donation occurred before five years prior to the bankruptcy case, and because we have been addressing a question of state law, we think it necessary to explore this facet of the analysis in some depth.

dendum is neither dated nor notarized, although spots were supplied for both. Guillot's sole "rental payments" were collected in 1992 and 1993 in the amount of $4,050. These payments were in the amounts of $3,550, $300, and $200. He never paid monthly. The uses to which the payments were put (by the **trustee**) included property taxes, fire district taxes, state taxes, payments to the parish clerk of court (apparently for deposits in connection with litigation then ongoing). So, payments of certain of the tax obligations were made with the "rental payments" that came from Guillot. The "rental payments" of $4,050 lasted for some 2½ years worth of obligations that were due on the property and/or in connection with litigation involving Guillot (and/or the trust).

The purported lease and surrounding documents and circumstances then, which appear to have been designed to show the trappings of divestment of ownership (simultaneously with continued retention of possession) can be summarized:

The lease is purportedly executed on a date that is 10 months prior to the beginning of the lease. It is not notarized. The payments were not made according to the lease, but through another undated document, the amounts due are waived. The lease expired four years before the property was sold and contained no renewal term. The addendum made Guillot "responsible" for those amounts for which he was already responsible, but some of these were paid through the "trust" from "rental payments" funneled through the trust by Guillot.

The other indicia of Guillot's control over the property are numerous, and closely parallel the *Anderson* case. Guillot paid the homeowner's insurance, which was issued to him and his wife as the homeowners, paid many of the taxes, and maintained the property. Guillot retained the fair market rental value of the property for himself. Those taxes paid by the trust were paid from the purported "rental payments," which were in fact monies that were simply deposited with the trustee/attorney so that payments could be made to the Clerk of Court by the trustee as attorney, and could be used to pay certain of the property tax bills so that it could appear as if the trust was functioning independently.

Next, and of much importance to this Court, are the facts making up the circumstances creating the sale of the Louisiana residence and purchase of the Tennessee residence. The evidence established that Guillot decided that he wanted to move to Tennessee (the Nashville area) to see if he could get work as a musician. Without consulting the trustee of the trust, he personally put the Louisiana residence up for sale. According to the testimony of Prendergast, the trustee, he had no involvement in listing the house for sale, did not know the house was up for sale, had no input about hiring a real estate agent, fixing a sales price, etc. In fact, it appears as though the trustee was never involved in sale of property discussions. According to his testimony, Guillot and his sons "were handling so much stuff themselves they didn't need me."

Guillot's testimony on this score is consistent with the trustee's. The boys let him put the house up for sale; he had discussions with the boys about the sales price. He obtained a "walk through" appraisal; he dealt with the real estate agent(s); he purchased a "House for Sale" sign and put it up in the front yard. He showed the house.

As mentioned, the original trustee resigned by act dated March 9, 1998. According to Prendergast, he had no knowledge of the pending sale of the Louisiana residence or prospect of purchasing the Tennessee replacement residence when he resigned. (The sale of the Louisiana residence took place some 17 days later, and the purchase of the Tennessee residence on the day following the sale of the Louisiana property.)

Guillot and his wife moved and took up residence in the Tennessee property purchased with the proceeds of the sale of the Louisiana residence. There was no lease or rental agreement with the trust. In fact, Guillot could recall no discussions about paying rent. Guillot has paid the property taxes and obtained, in his name as owner, homeowners' insurance upon the Tennessee property.

Guillot argues that the plaintiffs have a "Simon LeGreed" attitude with respect to the amount a father must pay the sons to remain in a house that he has donated to a Trust in which they are the beneficiaries. Guillot argues, and so testified, that the beneficiaries were free to set the rent, and that he was appropriately allowed to live (indefinitely) rent-free because he had no wherewithal to make continued rent payments. Two things occur to us that, together, establish that Guillot completely misses the point. First thing. The issue is not a father paying his sons. The issue is the father paying the *Trust*. The father is, purportedly, a tenant. If the sons so wish, they are free to assist their father. The trust should not have been so free, absent reservation of usufruct. The trust exists to benefit the beneficiaries.

■■■ The second thing (and we don't think Guillot sees this coming). Guillot's inability to pay rent, in absence of reservation of usufruct, is in fact evidence of lack of donative intent and sheds light upon the various (feeble) attempts to construct a lease arrangement in form. If he couldn't pay rent, then the purported donation had to have been done with the foreknowledge of this inability and with foreknowledge of the certainty that after the "donation" his maintenance of possession and the other trappings of ownership would be complete. Without means to act as a non-owning party (i.e., lessee), the retention of possession, absent a reservation of usufruct,

makes it clear to this Court that he lacked the intention to divest himself of ownership. To have done so would have taken only a single paragraph reservation within the act of donation. To have placed the reservation within the act of donation would have obviated the necessity of going through the motions of the barely concealed fake lease (made so, by, *inter alia*, the waiver of lease payments and allowing the lease to lapse without there being a successor lease or renewal in place). It wasn't done, though, in the face of knowledge that any "lease arrangement" would be a sham. We can draw no other conclusion from the urge to construct a facade, than that it was thought to be necessary to maintain the original facade which was the act of donation itself.

Another major conceptual difficulty that acts to confirm our conclusion that Guillot lacked donative intent is the manner in which the trust was handled, as a trust. Though we profess no trust law expertise, and the following concerns were not pointed out by the plaintiffs, we wonder if the trust was in fact a properly functioning trust, after the resignation of Prendergast as trustee.[58]

Prendergast resigned as trustee on March 9, 1998. On March 10, 1998, Kirk David Guillot was appointed by Guillot (in his capacity as settlor) as successor trustee. All looks fine. Except one thing; Kirk David Guillot could not be appointed successor trustee by Guillot in his capacity as settlor. Unless we are missing something, Kirk David Guillot could not be appointed trustee, as he was a beneficiary. He could not be appointed successor trustee because he was not designated as successor trustee within the trust agreement. He could not be appointed successor trustee by Guillot, settlor, because Guillot did not reserve to himself the power to appoint

---

58. This is a legal question, concerning the trust set up or form. Pretty clearly, from an administrative perspective, the trust was not operated according to the duties of a trustee,

as established by the Louisiana Trust Code, before Prendergast's resignation. *See,* La. R.S. 9:2061, et seq. Whether he should or not, we think even Prendergast would agree.

a successor trustee by means of modification or amendment to the trust.

The Louisiana Trust Code is found at La.R.S. 9:1721, et seq.

The original trustee, alternate trustee, or successor trustee may be designated within the trust instrument or chosen in the manner designated in the trust.[59] Failure of a trustee to serve, or disqualification of a trustee, or even failure to designate a successor trustee shall not invalidate the trust; "In such a case the proper court shall appoint one or more trustees." [60] A provisional trustee may be appointed by the court, summarily.[61]

A settlor may modify the trust "after its creation only to the extent he expressly reserves the right to do so." [62] The settlor can reserve the right to revoke the trust,[63] or may even reserve the unrestricted right to modify and/or revoke the trust.[64]

Within the article defining the beneficiary, it is made clear that "a trustee of a trust, in his capacity of trustee, can be the **beneficiary of another** trust," [65] but this article is the only reference to the question whether a beneficiary of a trust can be the trustee of the same trust.[66] Prior law allowed the beneficiary to be trustee under certain circumstances,[67] but present law seems to exclude beneficiaries of a trust from acting as trustees of that trust.

We mention this Louisiana trust law to point out other evidence that militates against a finding of donative intent. The trust instrument by which the Louisiana property was donated to Prendergast contained no reservation, by Guillot, of authority to revoke or to modify the trust instrument. In fact, the trust instrument provides that "the Settlor shall have no right to alter, amend or revoke this trust, and this trust shall be absolutely irrevocable."

Prendergast was appointed original trustee, and the trust instrument also provides, regarding a successor trustee, that "In the event of the death of Trustee, or in the inability or failure of Trustee to serve, Ronald Lee Guillot shall be the successor Trustee of these trusts and shall have all the Trustee's rights, . . ." There are no other provisions regarding appointment of a successor trustee. As mentioned, the evidence established that Prendergast resigned. There is no evidence concerning any communication with Ronald Lee Guillot, or even that would establish who he is (or was). There is no evidence of the appointment by a court of a successor trustee, provisionally or otherwise. The successor trustee, Kirk David Guillot, is one of the beneficiaries of the trust, and was "appointed" by Guillot as settlor, simply by means of a written act of appointment.

We conclude from the foregoing as follows:

■ 1. Ronald Lee Guillot should have been appointed successor trustee or,

59. La.R.S. 9:1785.

60. *Id.*

61. La.R.S. 9:1786.

62. La.R.S. 9:2021.

63. La.R.S. 9:2022.

64. La.R.S. 9:2023.

65. La.R.S. 9:1801.

66. It means that the settlor can be the trustee, as long as the settlor is not the beneficiary.

There is no prohibition upon a settlor being trustee in the present law, though the prior law, La.R.S. 9:1873, read "The settlor of a trust should not be the trustee of that trust; but either spouse may be the trustee of a trust of which the other is the settlor." La.R.S. 9:1873, Acts 1938 No. 81 § 17, repealed Acts 1982, No. 435 § 1.

67. *See,* La.R.S. 9:1874, amended by Acts 1950 No. 232 § 1, repealed by Acts 1982, No. 435 § 1, which read, A beneficiary of a trust shall not be the sole trustee or one of two trustees of a trust; but beneficiaries may be trustees so long as they are outnumbered by trustees who are not beneficiaries.

if he would have declined, the Louisiana state court should have been called upon.

■ 2. The purported appointment of Kirk David Guillot as successor trustee constituted an improper (and unlawful) attempt by the settlor to modify the trust, because he had no power to do so.

■ 3. While Kirk David Guillot might have been able to act as trustee of the brothers' trusts, if the trust was divided (properly) under the trust law,[68] and the trust instrument had provided a process by which he could have been appointed successor trustee, he could not have acted as trustee of his trust, because he was the beneficiary of his trust.

Guillot (and his successor trustee) therefore spent much time circumventing trust law. These facts, and the law we think is applicable, establish the extent to which Guillot maintained unqualified control over the property purportedly belonging to the trust. (Frankly, we are concerned that the Louisiana residence was never transferred, under applicable state law, by the trust to the purchaser;[69] we are also concerned that the trust never properly acquired the Tennessee property.) His control was maintained to the extent that (at least as far as he was concerned) it was necessary and appropriate that he ignore applicable trust law, appoint himself the maker of laws concerning the trust, and rule under those self-made laws as he saw fit.

The last Guillot argument we will mention is the one by which he seeks to explain his underlying motivation for establishing the trust and transferring the Louisiana residence by the donation. According to the defendant himself, and oth-

er testimony at trial, Guillot's prompting concern was his upcoming marriage. Apparently, he had previously unsuccessful marriages and, according to Guillot, he did not want to risk having to deal with his house as a part of his upcoming marital community, should the third time prove not to be the charm. There was even corroborating testimony from Mr. Gallent, a CPA and friend of Guillot, who had done work in the area of "estate planning." According to Mr. Gallent, he advised Guillot, after learning only that he was getting married and owned a house, that it was a good time to establish a trust.[70]

Why establish the trust? Because, we are told, he was getting married. There are several problems with this explanation, both legal and (in addition to Mr. Gallent's problematic testimony) factual in nature. The legal problem with the explanation is that the house was Mr. Guillot's separate property, and under Louisiana law would have remained his separate property after his marriage.[71] To insure that the natural and civil fruits of the separate property would remain separate property, Guillot would only have had to file a declaration in the records of the parish where the property was located.[72]

In fact, Prendergast, Guillot's lawyer (and the original trustee), testified that he had an extensive family law practice and that the Guillot trust was the first trust he had ever drawn up. He testified that he knew of no reason for the trust within the context of maintaining the house as Guillot's separate property. And this was Guillot's own lawyer and the original trustee.

---

68. *See,* La.R.S. 9:2030. This trust instrument did call for the division of the trusts into three trusts.

69. Moments like this make us happy we are not particular title lawyers.

70. Apparently there was no other discussion designed to elicit other facts that might be germane to the "planning" of Mr. Guillot's

estate. The Court does not value the testimony of Mr. Gallent as credible, and hopes that he is presently pursuing other employment endeavors.

71. La.Civ.Code art. 2341.

72. La.Civ.Code art. 2339.

Factually, the explanation is problematic because Guillot and his to-be wife did file just such an agreement and actually opted out of the community property regime altogether, in addition to declaring that all civil fruits of their separate property would remain separate property.[73] The matrimonial agreement, executed in proper form (authentic act), on November 14, 1990, was filed of record on September 25, 1991.

So, the explanation has no legal basis. The explanation is also undone factually, by the matrimonial agreement that was in fact executed by Guillot under applicable state law.

### BACK TO THE MORTGAGE

We think the facilitator of this series of non-transactions was the collateral mortgage placed upon the property notwithstanding a contemporaneous understanding that there was in reality no mortgage. This allowed Guillot the protection of a mortgage on the public records showing up to $200,000 worth of encumbrance upon the house (plus interest, etc.). Though it appears that Guillot subsequently experienced a rocky time, because the bank either forgot, or perhaps was attempting to foreclose upon the other piece of property encumbered by the mortgage, in Guillot's mind there was no mortgage covering his house, from the September 6, 1990, recordation date.

Guillot maintained the appearance of the mortgage for some two and one-half years after he received the mortgage note marked "paid," holding off from having it canceled on the public records until the

Louisiana residence was sold (and it had to be).

Why? Simply because no one would care to challenge the donation, because it was of a piece of fully mortgaged property. Guillot waited until (we think) he believed a sufficient period of time had passed after his bankruptcy, and canceled the mortgage as an integral component of his attempt to shed the Louisiana property and replace it with a new Tennessee home.

The hope, legally, was to outlast the three-year preemption period for the Louisiana revocatory action,[74] which is no longer than three years, from the date of the transfer.[75] Though Reynolds obtained a judgment in 1991, it is assumed that creditors of Guillot might well have noticed the transfer on the public record but not challenged it because it was value neutral.

We glean from the conduct surrounding the mortgage that it was a tool used by Guillot to facilitate the sham, by which he fully intended to retain not only possession of the property (as he could have with reservation of usufruct), but all facets of ownership thinly veiled by the trust device. Ultimately, the interwoven strands had as the objective the residual full ownership (unencumbered by even a lawful trustee who might wake up one day and take control) of a place in another state, far away from the one creditor who could still chase (Reynolds), and far away from his bankruptcy trustee (who hopefully would have moved on to other files).

Regardless of whether the absolute simulation and adverse presumption articles apply, the *Anderson* case and Civil Code

---

73. *See*, Exh. P. 6. Louisiana law allows the opting out from the community regime. LA. CIV.CODE art. 2328.

74. LA.CIV.CODE art.2036 reads as follows:
 **Art.2036. Act of the obligor that causes or increases his insolvency**
 An obligee has a right to annul an act of the obligor, or the result of a failure to act of the obligor, made or effected after the right of the obligee arose, that causes or increases the obligor's insolvency.

75. LA.CIV.CODE art.2041 reads as follows:
 **Art.2041. Action must be brought within one year**
 The action of the obligee must be brought within one year from the time he learned or should have learned of the act, or the result of the failure to act, of the obligor that the obligee seeks to annul, but never after three years from the date of that act or result.

Article 1468 establish that Guillot lacked donative intent and that the donation to the trust was an absolute nullity. We reiterate that we reach our conclusion without application of the aforementioned presumption, finding that plaintiffs have proven by far more than a preponderance of the evidence that the donation was a nullity (as we mentioned, Guillot's own "best" argument—that he was too poor to pay rent—in fact aids the trustee).

### The Remedy; The Interaction of State Law and § 544(a)

Plaintiffs argue that the remedy arises from either § 544(b) or § 541(a)(1) and § 541(a)(7) of the Bankruptcy Code. Section 544(b) should be used, it is suggested, because under state law a creditor of the debtor could avoid an absolute simulation.

We have determined that § 544(b) is not applicable, but that through the trustee's strong-arm power established by § 544(a)(1) and (2), the hypothetical ideal lien creditor status, the trustee can recover, ultimately, the Tennessee property for the benefit of the bankruptcy estate.[76]

 Section 544(a)(1) and (2) [77] provide the trustee with the power to avoid transfers of property of the debtor that could be avoided under non-bankruptcy law by a hypothetical ideal lien creditor. Also, the trustee is granted the power or status of an hypothetical ideal lien creditor

of the debtor, as of the commencement of the case, with the scope of the lien status exceeding property of the debtor. Therefore, if applicable non-bankruptcy law would have allowed such a lien creditor to obtain a lien upon the Louisiana residence, the trustee, to the extent of the claims against the estate and that arise in connection with administration of the estate has the power and status of such a lien creditor. We pause to reiterate here that § 544(a)(1) and (2) provide alternative but co-extensive powers and rights.

1. The ideal lien creditor has the power and right to avoid transfers of **interests of the debtor** in property or the incurrence of obligations **of the debtor** that the ideal lien creditor could avoid under applicable non-bankruptcy law. *OR* (and)

2. The ideal lien creditor has the **rights and powers (the status) of the ideal lien creditor of the debtor** upon any property to or upon which such an ideal lien could extend (to encumber) under applicable non-bankruptcy law.

 The clear language of § 544(a)(1) and (2) establish that this second facet of the strong-arm powers extends the scope of the ideal lien (held by the trustee as ideal lien creditor) to property that is not (as of the commencement of the case) the

---

**76.** We are not certain of the standing of an unsecured creditor to obtain an adjudication that an act of donation is a nullity, but do not wish to explore it much. We think that the holder of an unliquidated unsecured claim would have a difficult time obtaining such an adjudication. We think the creditor with standing would be the judgment creditor seeking an adjudication that due to the nullity of the transfer the judgment would attach to the property.

**77.** Section 544(a)(1) and (2) reads as follows:
 **§ 544. Trustee as lien creditor and as successor to certain creditors and purchasers**
 (a) The trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may

avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by—
 (1) a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained such a judicial lien, whether or not such a creditor exists;
 (2) a creditor that extends credit to the debtor at the time of the commencement of the case, and obtains, at such time and with respect to such credit, an execution against the debtor that is returned unsatisfied at such time, whether or not such a creditor exists; or

debtor's property under applicable non-bankruptcy law.[78]

The scope of both the power or status of the trustee and the strong-arm avoidance power must be found by resort to non-bankruptcy law. Absence of avoidance power, however, does not deprive the trustee of the status or power alternatively granted.

> If avoidance cannot be located in non-bankruptcy law, then the trustee can avoid nothing under section 544(a). Yet even if non-bankruptcy law does not refer to avoidance, the trustee would still have the "rights and powers" of a judicial lien creditor.[79]

We have stated in a prior opinion, as something of an aside, that "the avoidance action is not property of the estate (but rather recovery pursuant to an avoidance power is property of the estate)—*see* § 541(a)(3) ..." [80]

Though we are mindful of our previous reference to the provisions of § 541(a)(1), (3), and (4) as constituting the Code provisions generally establishing the estate and particularly relating to avoidance powers, we think it time to address

what has long been a nagging concern. How does § 541(a) (subsections (1), (3), or (4)) relate to the ideal lien power and status, established by § 544(a)? We think the ideal lien creditor status is not limited by the debtor's pre-bankruptcy interests and/or rights (legal or equitable) in, to, or upon property, but see § 541(a) as having been written to describe the various interests of the debtor to which the estate succeeds. Also, we cannot help but think that by definition a lien upon property grants the lienholder an interest in that property subject to the lien. Under § 544(a), then, the ideal lien creditor status seems to create by its terms a property interest co-extensive with the scope, rank and extent of the ideal lien, to the full extent of the reach of such a lien (as would exist under applicable non-bankruptcy law) and to the full extent, quantitatively, necessary to pay all claims against the estate, including administrative claims.[81]

We cannot escape it. This lien interest looks like a property interest which looks like property of the estate because it is the trustee's, or the estate's property interest. And, what is more, it looks to be different

---

**78.** We recognize but disagree with cases that have concluded that the scope of the § 544(a) ideal lien creditor status is limited by means of being exercisable only upon (against) property in which the debtor had an interest as of commencement of the case, and that is described as property that comes into the estate under § 541(a). *See In re Armstrong*, 56 B.R. 781, 785 (W.D.Tenn.1986); *In re Northern Acres, Inc.*, 52 B.R. 641 (Bankr.E.D.Mich. 1985).

**79.** David Gray Carlson, "Bankruptcy's Organizing Principle," 26 Fla.St.Law Rev. No. 3, p. 560. Hereafter, this article is referred to as "Carlson." We do not presume to be able to offer an articulated summarization of Professor Carlson's article, nor do we need to adopt the entire spectrum of his thinking. In this case we are dealing with an insolvent estate, which requires that the quantitative component of the trustee's lien creditor power or status is greater than the value of the property made the subject of the act of donation and is greater than the value of the Tennessee property that was improperly pur-

chased to replace it. Professor Carlson is intent on explanation of the theory that the trustee's lien creditor status is the primary organizing principle by which property becomes property of the estate, and as well (or, maybe, as may be said another way) that it is the fount of all avoidance power. What this seems to mean, particularly in this case, is that the judicial lien status by which the trustee's interest in the Louisiana property, as of the commencement of the case, primed that of the trust was *itself* property of the bankrupt estate. As we will show, judicial lien creditors of the debtor, as of bankruptcy, could have ignored the purported transfer, and would not have been bound, as Guillot would have, (by the state law imposed parole evidence rule) to adhere to the terms of the authentic act of donation.

**80.** *In re Lair*, 235 B.R. 1, 62 (Bankr.M.D.La. 1999).

**81.** It is the trustee who, as representative of the estate, possesses the rights and powers of the ideal lien creditor of the debtor.

from those property interests delineated within § 541(a), that comprise estate property. Assuming we are right, that § 544(a) does describe a property interest, does it nevertheless come into the estate through § 541(a)?

Our limited focus upon § 541(a)(3), in the past, was probably misplaced, or at least incomplete or unclear. Section 541(a)(3) does refer to "any interest in property that the trustee recovers under section ... 550 ...," and § 550(a) does provide that "to the extent that a transfer is avoided under § 544, 545, 547, 548, 549 ... the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property...." By the terms of the two statutes, which seem to work in tandem, they are limited, however, to the actual property (including money) that represents the fruit of trustee recovery from avoiding transfers.[82]

However, because of the lien creditor status of the trustee (as of the commencement of the case), which is a power set off from the § 544(a) avoidance power, it is improper to see § 541(a)(3) as applying to that property over which the trustee's lien creditor status extends, as of commencement of the case. The language tells us this. Section 541(a)(3) particularly refers to the fruits of the avoidance action, and presumes, through the use of the word "recovers," that the property must be recovered to become estate property. However, the lien creditor status, by definition, establishes a property interest by means of § 544(a), without regard to the possibility of an avoided transfer generating personal liability and that personal liability bearing fruit. The lien creditor status is the equivalent of a property interest to the extent, under applicable non-bankruptcy law, the hypothetical ideal lien creditor could have obtained one.[83] The lien creditor is hypothetical, but the value of the claim seeking to be secured by means of the lien creditor status must be the full extent of the estate being administered. Put another way, the ideal lien has a maximum value equal to the aggregate amount of the claims of all unsecured creditors, including administrative creditors (presumably including interest under § 726(a)(5)). Therefore, § 541(a)(3) does not refer to or deal with the lien creditor status established by § 544(a), as that status, which establishes the property interest for the estate in the property subject to the lien, predates any "interest in property recovered" under § 550, because it is created and effective from commencement of the case. The trustee, as hypothetical ideal lien creditor, is, by federal law (§ 544(a)), granted the rights of a lien creditor who has "exercised these rights in their entirety."[84] Therefore, any act necessary to perfect the hypothetical ideal lien upon property that could be (or could have been) subject to such a lien is deemed, by the language of the statute, to have been done.

What about § 541(a)(4), which delineates as property of the estate, "any interest in

**82.** Professor Carlson submits that the avoidance power is the natural outgrowth of the lien creditor status, and sees § 550 as the means by which personal liability is imposed upon third parties. *See*, Carlson, p. 569, note 76.

**83.** According to Professor Carlson, and this is one of his central themes, it is § 544(a) which generates, informs and limits the avoidance power to the case-by-case lien creditor status, as it can be quantitatively determined. He is interested in insuring, for example, that recovery from avoidance actions, in surplus cases, does not generate, through § 726(a)(6),

a return of the surplus to the debtor, when pre-bankruptcy the debtor had no interest in the property subject to the avoidance action. He accomplishes this by arguing that all avoidance actions are outgrowths of, and limited by, the judicial lien creditor status, and therefore, that the third party's interest in the property subject to the lien creditor status is simultaneously obliterated and subordinated to the interest of the estate but not (necessarily) the debtor.

**84.** *In re Peregrine Entertainment Ltd.*, 116 B.R. 194, 207 at n. 19 (C.D.Cal.1990).

property preserved for the benefit of or ordered transferred to the estate under section 510(c) or 551 of this title"?[85] Again, § 551 seems to postdate the effect of the immediate and ideal lien creditor status under § 544(a). Section 551 perhaps serves a clarifying purpose (an avoided transfer would seemingly go away; § 551 preserves it), but it does not appear to augment the lien creditor status/power under § 544(a). The ideal lien creditor status is what it is, from commencement of the case, and the creation of the lien creditor status, without more, subordinates to the lien creditor status the rights of any party whose interest in any property would be subordinate to the hypothetical ideal lien creditor, whose interest is duly perfected, under applicable non-bankruptcy law. As Professor Carlson notes, "If section 551 were repealed, the trustee could still expropriate avoidable liens by means of the strong-arm power. Those liens, brought into the estate, would include the power to foreclose junior liens."[86]

We note that § 551 does serve the purpose of resolving the conceptual difficulty

(the answer to which is not necessarily apparent to everyone) inherent in the question, "where does an avoided transfer go."[87] Also, the limitation that preservation of avoided liens, transfers, etc. to property of the estate does dictate the extent to which the avoidance powers can extend to non-estate property.[88] So, we think it possible that like § 550, § 551 does serve some purpose, but we are concerned because the effectiveness of § 544(a) affixes the estate's interest in all property upon which the hypothetical judicial lien would attach, as of the commencement of the case, while § 541(a)(4) seems to fall within the group of subsections dealing with property that might come into the estate after commencement.

We might as well go on and admit that we are getting ourselves, at least at first glance, in trouble, statutorily. We are running out of subsections of § 541(a) that might apply to "bring" property subject to the ideal lien into the bankruptcy estate. What about § 541(a)(1)? The problems are apparent. First, our discussion has already determined that the ideal lien sta-

---

**85.** 11 U.S.C. § 510(c) reads as follows:

**§ 510 Subordination**

. . .

(c) Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may—

(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or

(2) order that any lien securing such a subordinated claim be transferred to the estate.

11 U.S.C. § 551 reads as follows:

**§ 551. Automatic preservation of avoided transfer**

Any transfer avoided under section 522, 544, 545, 547, 548, 549, or 724(a) of this title, or any lien void under section 506(d) of this title, is preserved for the benefit of the estate but only with respect to property of the estate.

**86.** Carlson, p. 598.

**87.** Preservation of the transfer resolves the possibility of confusion over whether the

transferee, for example, must be put back into the pre-transfer position on an administrative basis (we still hear that around here). Also, while § 544(a) may indeed fix the quantitative extent to which a transfer is avoidable, say as a preference, the judicial lien status, at least under Louisiana law, would not generate the possibility of avoidance of a preferential transfer. This point does not address the notion advanced by Professor Carlson (I think) that avoidance of a transfer brings the transfer itself under the encumbrance of the all-encompassing judicial lien (much like buying immovable (real) property in the face of a recorded judgment would expose the property to the judgment), but only the question of whether § 547 is necessary as a cause of action in addition to the lien creditor status.

**88.** The legislative history gives the example that "This prevents the trustee from asserting an avoided tax lien against the after-acquired property of the debtor." 124 Cong.Rec. H11097 (daily ed. Sept. 28, 1978); S17414 (daily ed. Oct. 6, 1978); remarks of Rep. Edwards and Sen DeConcini.

tus extends to property in which the debtor, as of commencement of the case, had no interest, or had an interest that was subordinate to the other party's interest. In this sense, then, the lien creditor status of § 544(a) is broader than the scope of § 541(a)(1).

In another way the lien creditor status is different from and seemingly more powerful purveyor of property into the estate than is § 541(a)(1). Section § 544(a) provides the estate with a more powerful hold upon the legal and equitable interests of the debtor in property than the debtor had as of the commencement of the case, doesn't it? Between the hypothetical judicial lien creditor and the debtor, the hypothetical judicial lien creditor has superior claim to the debtor's non-exempt assets. Also, the ideal lien creditor status is different in nature than the debtor's legal or equitable interest in property, as the debtor, pre-bankruptcy, could not have obtained an ideal lien upon the debtor's own property as a consequence of a simple contract with herself or having obtained a judgment against herself subject to execution upon her property. Therefore, the property interest created by the creation of the ideal lien creditor does not appear to be property of the estate by means of the working of § 541(a)(1) either.

We are to the point where it is obvious that § 541(a)(1) is not the vehicle by which the ideal lien interest becomes estate property. It has been suggested that because of the ideal lien, § 541(a)(1) is superfluous, that any interest of the debtor in property that becomes property of the estate has already come into the estate by means of the creation of the ideal lien.[89]

■ We think differently, though, and the difference between the interests required by the estate through § 541(a)(1) and § 544(a) have something to do with the ultimate resolution of this proceeding. Though the lien creditor status upon the debtor's property would prime the debtor's interest in that same property from a priority/subordination perspective, we do find that there is a reason for § 541(a) that causes it not to be superfluous.

Bankruptcy estates must be administered and are so administered by various acts of various parties. The Bankruptcy Act provisions regarding the trustee taking title to all property of the estate have been supplanted; the trustee is now the representative of the estate. The power, status, and rights of the ideal lien creditor are not synonymous with the debtor's rights in, to, and upon property. The ideal lien creditor interest may be, in the final analysis, more powerful as a matter of priority, but, practically we have noticed time and time again, that the bane of many a creditor holding a valid lien upon, say, a car of a borrower, is the simple fact that the car moves. Usually away from the creditor, while being driven by the borrower. The "cars move" principle is behind many a bankruptcy filing. It is, for example, only after the car quits moving (i.e., after it has been seized) that many would say a Chapter 13 bankruptcy case designed to pay the secured claim out over time is necessary.

■ The priming claim to the property that is the ideal lien is still burdened with the necessity of its having to be asserted. Though created by operation of law, as of commencement of the case, it is not self-actualizing. Though its priority, scope, and nature are inherent in its creation as an ideal lien status or power, it is as well limited by its nature as a lien. The ideal lien status is conferred by the ideal lien, which presumes that there is yet another step to take, before the full scope of the interest created by the lien is actualized. While all acts necessary to its perfection have, hypothetically, been deemed to have been done, and while the value of the claims seeking satisfaction by means of the ideal lien (the claims against the estate) is

---

**89.** Carlson finds no reason for § 541(a)(1) to exist, concluding that "section 541(a)(1) simply repeats what is already implicit in § 544(a)." Carlson, p. 569.

in place, the ideal lien, because it is a lien, must be enforced (or declared). Because we must look to non-bankruptcy law to give substantive flesh to the statutory bones, we see that the ideal lien is ideal in its ranking as to and enforceability upon property. Actualization of the ideal lien cannot occur independent of the necessity of judicial declaration (or perhaps private agreement subject to judicial authority) as to its effect, extent, priority, etc. We think that this simple distinction between lien rights and ownership interests survives even the designation of the § 544(a) lien rights or status as "ideal." [90] This need for recognition is immediately apparent within the context of the trustee's relationship, as ideal lien creditor, to a non-debtor party asserting an adverse claim to property the trustee suggests is subject to the ideal lien.

However, this basic condition, inherent in the fact that the ideal lien is still a lien, has consequence as well *vis a vis* the debtor's interest in property. If the bankruptcy estate was comprised only to the extent of the ideal lien creditor status, can it be said that the trustee, as ideal lien creditor, would by means of that status have the same primary administrative capabilities as are now possessed because of § 541(a)? We think not. As we have said, the creditor status is a property interest. Such a property interest is not the same as ownership, is not self-actualizing. This basic fact generates the protections afforded under federal and state Constitutions, federal and state truth-in-lending and consumer's rights laws, the necessity of employing process of some sort to obtain mere possession over the thing over which your interest (ultimately) primes the interest of the one driving around (in the car upon which some lien, say, is ideally affixed); within the bankruptcy case context, it is the reason for the necessity of having the ideal lien rights declared.

From the estate administration standpoint, the succession to the debtor's interest in the property resolves the problems inherent in a trustee position, *vis a vis* the debtor, of the ideal lien status providing only ideal lien status. Yes, as lien creditor, the trustee ultimately primes, but without more than is said through the present language of § 544(a), the interest in property created only by means of § 544(a) would remain subject to the necessity of judicial declaration as to the position of the lien, *vis a vis* the debtor, and the debtor's pre-bankruptcy rights to the property. We think that because § 541(a)(1) says what it says, § 521(4), for example, says what it says.[91] By filing bankruptcy, the debtor's state and federal law protections, afforded because of the debtor's pre-bankruptcy interests in property, with respect to the trustee (and, as such, the ideal lien creditor) are checked **by the debtor** outside the door of the courthouse. The trustee takes over, administratively, where the debtor left off. The debtor is still a person (has to be), but not one who can assert that the trustee is in fact **limited** by the judicial lien creditor status (the scope, extent, rank of which is determined by non-bankruptcy law) as the judicial lien creditor, even idealized, would have been outside bankruptcy. *Vis a vis* the debtor, the trustee has free reign over the estate, because of § 541(a)(1), though from a strictly priority of right standpoint,

**90.** Later we deal with how the "ideal" quality does have an effect upon the way in which the estate can realize upon the lien rights. We think the judicial declaration does it, without the necessity of participating in an enforcement procedure under the applicable non-bankruptcy law from which the substance of the ideal lien emanates.

**91.** 11 U.S.C. § 521(4) reads as follows:
**§ 521. Debtor's duties**

The debtor shall—
. . .
(4) if a trustee is serving in the case, surrender to the trustee all property of the estate and any recorded information, including books, documents, records, and papers, relating to property of the estate, whether or not immunity is granted under section 344 of this title;

it is correct to say that § 541(a)(1) is unnecessary. Because of § 541(a)(1), though, the primary usefulness of § 544(a) is to expand the estate past the debtor's rights to which the estate succeeds under § 541(a)(1), to extend the estate past the priority between the parties (debtor and third party or particular creditor) that would otherwise exist under non-bankruptcy law.[92] In fact, we suppose that we could borrow a Louisiana state law concept to show the mechanics of the interplay. (We do not suggest that state law controls; we use it because we are comfortable with the concepts.)

Under Louisiana law the security interest is ancillary to the principal obligation, and depends upon the principal obligation for its existence.[93] Under Louisiana law, generally, "when the qualities of obligee and obligor are united in the same person, the obligation is extinguished by confusion."[94] Particularly, regarding mortgages, for example, a mortgage is extinguished "by confusion as a result of the obligee's acquiring ownership of the thing mortgaged."[95] We do not think these concepts are unique to Louisiana law, and we see no reason (though we might not be seeing far enough) that these principles could not be used to analyze the relationship and practical interplay between § 541(a)(1) and § 544(a). As of the commencement of the case, we have seen at least two things happen. The estate is created, and the ideal lien creditor status is established. As mentioned, the lien creditor status over the debtor's property is of priming strength over the debtor's pre-bankruptcy ownership rights, though we have posited a reason for the estate to succeed to the debtor's legal and equitable interests in property.

What about this notion? Both things happen simultaneously, the estate is created and the estate, through the trustee, obtains the ideal lien creditor status. It may be that a bankruptcy version of Louisiana's confusion occurs as well, with respect to that property which only the debtor has an interest. The estate seemingly should not be seen as both owning (comprised of) and having a lien upon that pre-bankruptcy property in which **only** the debtor had an interest. However, the confusion accomplishes something else, through § 544(a). By its terms § 544(a) effectuates a subordination of the other interests in the debtor's property (which might be a consequence different from that which would result under non-bankruptcy law—for example, a creditor who takes back property subject to a security interest may, under applicable non-bankruptcy law, have to take it back subject to any and all security interests that are not extinguished by resort to state law process).

We think the subordination of any such interests occurs by operation of law, subject to the necessity of obtaining a declaration of the subordination. Regarding the debtor, § 541(a)(1) establishes that there need be no such declaration. Regarding property that would not necessarily be the debtor's property under non-bankruptcy law, or would not be property upon which the debtor would be able to assert a viable interest under non-bankruptcy law,[96] § 544(a) provides the estate with an interest in the property in the same nature and to the same extent as the ideal lien creditor created by the section.

---

92. Generally speaking, though under non-bankruptcy law a security interest or right in, to, or upon property might not be protected against the claims of third parties, between the debtor and "unprotected" third party the debtor should be primed.

93. La.Civ.Code art. 3282.

94. La.Civ.Code art.1903.

95. La.Civ.Code art. 3319.

96. For example, as would be the case regarding Guillot and the act of donation, under applicable Louisiana law, notwithstanding our conclusion that the donation was a sham. More on this below.

In other words, what is left after the confusion occurs is the estate's ideal lien creditor property interest under § 544(a), upon property to which the debtor had no claim or interest (or an inferior claim or interest) prior to bankruptcy and the subordinated interests of those parties who did have interests in the pre-bankruptcy debtor's property but whose interests would have been subordinate to the ideal lien creditor of the debtor.

We cannot say that we are able to show just how the status created by § 544(a), which creates a property interest that is property of the bankruptcy estate, fits within § 541(a). We think that the property interest created by § 544(a) pre-exists avoidance, is different from the "interest in property that the trustee recovers" under § 541(a)(3), and pre-exists (and thereby subsumes) "any interest in property reserved ..." that is mentioned in § 541(a)(4).[97] In fact, it would be incongruous to limit § 544 by either § 541(a)(3) or (a)(4), as either (both) of these sections, by their placement in § 541(a), imply that the property referred to **comes into the estate** by "recovery" or by "preservation" (after avoidance) or by "ordered" transfer. The property interest that is created by § 544(a) predates any judicial recognition of it, and therefore, any property interest created by § 544(a) exists as of (or from) commencement of the case.

█ Therefore, while we think there is in fact reason for § 541(a)(1), (3), and (4), we conclude that § 544(a), through its creation of the "rights and powers," creates estate property as of the commencement of the case, to the extent applicable non-

bankruptcy law would provide property interests to the hypothetical ideal lien creditor. There is no doubt that a lien interest is a property interest. A lien and therefore property interest created as of commencement of the case is property of the estate created by the Bankruptcy Code just as the property interests to which the estate succeeds under § 541(a)(1) comprise estate property.

The Supreme Court, in *United States v. Whiting Pools*,[98] suggests that it is not necessary that property of the estate be "found" within one of the subsections of § 541(a). Discussing whether a debtor in possession bankruptcy estate retained an interest in property seized by the United States, the court concludes that the estate's interest in property should not be limited by the property interests particularly delineated within § 541(a). "Although these statutes could be read to limit the estate to those 'interests of the debtor in property' at the time of the filing of the petition, we view them as a definition of what is included in the estate, rather than as a limitation."[99]

█ Further, the court states that " § 541(a)(1) is intended to include in the estate any property made available to the estate by any other provision of the Bankruptcy Code."[100] According to the court, "Section 542 is such a provision ..." and that while there are limitations upon the estate's right to demand turnover under § 542(a), "none requires that a debtor hold a possessory interest in the property at the commencement of the reorganization proceedings."[101] We must note that the Supreme Court appeared uncomfortable

---

97. We do not consider that § 544(a) is necessarily referred to in, or depended upon for, § 541(a)(7)—"any interest in property that the estate acquires after the commencement of the case." The ideal lien creditor status exists as of commencement of the case. This language is the same as used in § 541(a)(1), which thereby sets § 544(a) off as different from whatever property might be acquired after the commencement of the case under § 541(a)(7), just as § 541(a)(7) is set off as different from § 541(a)(1).

98. 462 U.S. 198, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983).

99. *Id.,* 462 U.S. at 203, 103 S.Ct. 2309.

100. *Id.,* 462 U.S. at 205, 103 S.Ct. 2309.

101. *Id.,* 462 U.S. at 205–206, 103 S.Ct. 2309.

with the interplay between § 541(a) and § 542(a), but did conclude that the possessory interest afforded by § 542 was a property interest that became estate property notwithstanding its absence from those property interests described within § 541(a). We think precision, if achievable, is preferred, and believe it appropriate to read § 544(a) as creating a property interest that is estate property, notwithstanding the absence of such an interest on the part of the debtor to which the estate succeeds. We do not think *Whiting Pools* invalidates our analysis. If nothing else, the court would say something like "We need not address the bankruptcy court's notion that § 544(a) creates a separate component of estate property, because *Whiting Pools* establishes that the interest established by § 544(a), if nothing else, comes into the estate due to the scope of § 541(a)."

The only way to interpret the "rights and powers" clause of § 544(a) is as a statute that creates a property interest. Therefore, it must be seen alongside § 541(a) as part of the overall mechanism by which the bankruptcy estate is created.[102]

### OUR ANALYSIS OF § 544(A) APPLIED TO THIS PROCEEDING

We now analyze whether, as of the commencement of this bankruptcy case, the estate obtained an interest in the Louisiana residence that Guillot owned because the donation was a sham. The interest that was obtained, if any, was superior to whatever (if any) interest Guillot had in, to, and upon the property under applicable non-bankruptcy law. The real question concerns the relationship between our conclusion that the act of donation was a sham, and the ideal lien creditor status under applicable non-bankruptcy law.

As is pointed out by the *Anderson* court (*supra*), the Anderson attack of the transfer from the trust to Anderson would have been precluded by the parole evidence rule under Louisiana law, had there been objection at trial.[103] Under the Louisiana Civil Code, "An authentic act constitutes full proof of the agreement that it contains, as against the parties, their heirs, and successors by universal or particular title."[104] Accordingly, even in the event of the absolute simulation, "testimonial proof that the written act is actually a simulation may not be admitted when the apparent or simulated act contained in a writing purports to effect a transfer of immovable property."[105] The act of donation is required to be by authentic act, if it involves an immovable, "under the penalty of nullity."[106] Therefore, as between the parties, it is possible that in the situation of either absolute simulation or invalid donation (if the absolute simulation articles are not applicable), unless there be an allegation of fraud, or some other basis upon which one of **the parties to the transaction** could introduce testimonial (parole) evidence to challenge the authentic act, the written authentic act is the proof of the nature of the transaction. In other words, though Guillot's donation was a nullity, had he and

---

102. We thank Professor Carlson for his article. We think he is on to something important in his work on § 544(a). We do not go the whole way with him in deriding the importance or effectiveness of § 541(a)(1) or even (a)(3) or (a)(4). Also, because we have particularized fish to fry, we can stop here (we think), as opposed to trying to sew up the entire quilt. We note that he refers to *Whiting Pools*, is relieved that the court concludes that it is not necessary to pigeonhole estate property into one of the subsections of § 541(a), and ultimately is exasperated that not enough credence is given by the court to § 544(a). *See,* Carlson, pp. 568–569. From our subordinate perch, we think Professor Carlson is a bit too exacting. It is sufficient to us that the court opens the door to our version of the § 544(a) property right, and the prospect that our analysis of the interplay between § 544(a) and 544(a) is correct.

103. *Anderson,* 535 So.2d at 1073.

104. La. Civil Code Art. 1835.

105. Litvinoff, p. 399.

106. LA.CIV.CODE art. 1536.

the trust (his sons) ever fallen out, he probably would not have been entitled to use testimonial evidence to alter the effect of the act of donation.[107]

██ However, in the case of absolute simulation, Louisiana law provides that creditors of either the purported transferor can ignore the transfer which can only be accomplished by obtaining a declaration of simulation. This restriction upon parties is not present when the action involves a third party, "as third parties may avail themselves of that kind of evidence to prove a simulation adverse to their interests." [108] The absence of effects that is the nature of the civil action is the same as attends the finding that an invalid donation is a nullity for lack of donative intent.

██ The state law problems that would face Guillot in an action to challenge the donation bring into crystalline focus the effect of § 544(a) upon the present proceeding. Under applicable state law, the ideal judgment creditor, who would be able to attack the donation as an invalid donation because it was a nullity (*Anderson, supra*), or as an absolute simulation (if applicable), would have been able to elide the parole evidence restrictions that would

apply to Guillot, and would have been, through the lien creditor status, able to enforce the ideal judgment against the Louisiana residence, as of the commencement of Guillot's bankruptcy case. This property interest, the lien right upon the property, constitutes a property interest in favor of (or, we guess, just in) the bankruptcy estate, making it property of the estate. The interest of the Guillot trust (which perhaps was cognizable under state law, due to the public records doctrine),[109] is, by means of § 544(a), subordinated to that of the trustee (estate) as of the commencement of the case. The facts presented to this Court establish that there was no other third party creditor or bona fide purchaser who would have asserted a claim in priority to that of Guillot's bankruptcy trustee, who became the ideal lien creditor of Guillot, as of the commencement of the case.

Because of the ideal nature of the ideal lien, as of the commencement of the case, Guillot's bankruptcy trustee is deemed to have done everything that could have been done under applicable non-bankruptcy law to perfect the ideal lien upon the Louisiana residence.[110] So, though Guillot and the

107. In fact, in the Revision Comments, 1984, to Article 2026, it is said "Because of basic principles of written and testimonial proof, however, the apparent transferor may not succeed in attacking an absolute simulation in absence of a counterletter ... It can be said quite unequivocally today that a supposed transferor cannot establish a simulation unless he produces a written counterletter." See, Revision Comments—1984, Comment (b). As we have mentioned, while we are not relying upon the absolute simulation, we do not hold that it is inapplicable, and certainly do not consider it problematic to borrow these concepts for application to the sham donation. The donation articles mention attacking a donation as a nullity for want of form (LA.CIV.CODE art. 1536), or for such things as ingratitude, non-fulfillment of conditions, etc. (LA.CIV.CODE art. 1559). However, we also note that we see no reason why donations could not be dissolved on the grounds of fraud on the donor (LA.CIV.CODE arts.1953, et. seq.) or duress (LA.CIV.CODE arts. 1959, et seq.). These grounds, however, do

not apply to this particular case, even if they might apply to donations, generally, as we think it problematic to consider an action by Guillot to annul the donation based upon his having committed a fraud.

108. Litvinoff, p. 400; *see also, Heirs of Wood v. Nicholls,* 33 La.Ann. 744 (La.1881).

109. La.Civ.Code Arts.2028 and 2035.

110. The difference between the perfection having been deemed to have occurred and actually being self-actualizing is borne out by the fact that the residence was sold by Guillot and the trust, post-bankruptcy. Interestingly, this deemed perfection, as regards the Louisiana property, is tantamount to the bankruptcy trustee (as of the commencement of the case) having filed this lawsuit (without the claims to the Tennessee property) and having obtained this opinion and judgment hereupon (without the terms dealing with the Tennessee property, because the sale and purchase came much later).

trust did not know it, the bankruptcy trustee's lien was there, affixed upon the Louisiana residence, having subordinated all interests because of the lien creditor's ability to have obtained a declaration that the donation was invalid, as a nullity.

Presently, though, the trust is not the record owner of the Louisiana residence, having (by Guillot and the problematic successor trustee of the Guillot trust) sold it post-bankruptcy. In effect, the Louisiana residence, burdened by this ideal lien creditor property interest (the § 544(a) lien), was replaced by the Tennessee residence. What happens now? The property interest that was bankruptcy estate property that was affected by the sale of the Louisiana residence was the lien interest in, to, and upon the Louisiana residence, or, put another way, an interest in the Louisiana residence because of the lien and to the extent (and of the value) of that lien, that arose by operation of law. Several alternatives present themselves; we discuss these in full view of the fact that the trustee is pursuing the trust, the trust beneficiaries, and Guillot, and makes no claim against either the purchasers of the Louisiana residence or the sellers of the Tennessee residence.

■■■ There was, we suppose, the possibility of the avoidance action under § 549 against the purchaser of the Louisiana residence, because of the existence of the lien interest in, to, and upon the residence.

The lien interest, however, practically speaking, was not transferred out of the estate. The lien interest, it might appear, should (particularly if it is ideal) have followed the Louisiana residence into the hands of the purchaser, as it would have, if perfected under Louisiana law as of the commencement of the case. However, while federal law could effect such a result, § 544(a) is constrained, regarding its post-petition transferability. Section 549(a) of the Bankruptcy Code deals with the avoidance of post-petition transfers.[111] Courts routinely opine that § 544(a) has no applicability to post-petition transfers, but only to pre-petition transactions, and the avoidance of a post-petition transfer is possible only by means of § 549(a).[112] Professor Carlson, on the other hand, has no use for § 549, which he thinks he understands as subsumed by § 544(a) (and thereby pretty well redundant).[113] We think the relationship between § 549 and § 544(a) is much the same as Professor Carlson does, but we do not decry § 549 as impotent. We differ from the courts who relegate § 544(a) to pre-petition transfers, because, we think, § 549 simply does not work to give the trustee any relief in this proceeding, but § 544(a) does. We see the two sections working together, with § 549 acting to give federal reach to the § 544(a) lien, while providing federal limitations to that reach. We think that § 549 provides a sort of federal public records law,[114] that

---

**111.** 11 U.S.C. § 549(a) reads as follows:

**§ 549. Postpetition transactions**

(a) Except as provided in subsection (b) or (c) of this section, the trustee may avoid a transfer of property of the estate—

(1) that occurs after the commencement of the case; and

(2)(A) that is authorized only under section 303(f) or 542(c) of this title; or

(B) that is not authorized under this title or by the court.

**112.** *See, In re Branam,* 247 B.R. 440 (Bankr. E.D.Tenn.2000); *Meininger v. Harp (In re Stoops),* 209 B.R. 1 (Bankr.M.D.Fla.1997); *Eisenberg v. Bank of New York (In re Sattler's, Inc.),* 73 B.R. 780 (Bankr.S.D.N.Y.1987).

**113.** Carlson, p. 568, n. 75.

**114.** See the federalized version, § 549(c), which reads:

**§ 549. Postpetition transactions**

. . .

(c) The trustee may not avoid under subsection (a) of this section a transfer of real property to a good faith purchaser without knowledge of the commencement of the case and for present fair equivalent value unless a copy or notice of the petition was filed, where a transfer of such real property may be recorded to perfect such transfer, before such transfer is so perfected that a bona fide purchaser of such property, against whom applicable law permits such transfer to be perfected, could not acquire an interest that is superior to the interest of such good faith purchaser. A good faith

precludes an action against the purchasers of the Louisiana property, even though the Louisiana property was encumbered by the § 544(a) liens.[115] Thus, § 549, expressly § 549(c), is necessary to delineate the reach of the ideal lien (we deal with immovable property here), in light of the fact that the statute (§ 544(a)) has created an ideal lien whose reach is deemed perfected (and therefore fully extended) as of the commencement of the case. We think that the provisions of § 549(c) represent a federalized public records requirement, which protects third party purchasers of estate property (if they meet the § 549(c) criteria) from the effect of the ideal lien (created by § 544(a)), unless the bankruptcy petition was filed of record in the pertinent public records. There is no evidence that such a filing was done in this case.

The plaintiffs have suggested § 544(b) as the appropriate means of attacking the donation, and have then suggested that § 541(a)(7) [116] brings the Tennessee residence into the estate as property acquired by the estate after commencement of the case.

■ We have determined, however, that the following mechanism is the appropriate one. While it may be that the § 544(a) lien did not follow the Louisiana residence, that does not mean that it did not attach to the Tennessee residence upon the sale and subsequent purchase.

We have determined that the donation of the Louisiana property was invalid, and therefore, while the trust perhaps could have conveyed record title to the Louisiana property to the purchasers,[117] it was in fact Guillot who sold the Louisiana property, in concert with the trust form. It was, as well, Guillot who purchased the Tennessee property, using the trust form. We think this generated a claim by the estate against Guillot and the trust for the return of the value of the § 544(a) lien, which was a claim equal to the lesser of the entirety of claims against the estate (including administrative claims) or the value of the actual damage to the lien right done by the sale of the Louisiana residence (here, $182,000, the sales price, is less than the estate claims secured by the lien).

■ Now, both Guillot and the trust knew of Guillot's bankruptcy, so the trust cannot be heard to argue the absence of recordation of the bankruptcy petition or the failure of the § 544(a) lien to remain extant. Neither can Guillot. In fact, the Louisiana residence was exchanged for money. There is no statutory reason that the ideal lien creditor status, which imposed a lien claim upon the Louisiana residence, did not continue to reside where it started at,[118] firmly affixed upon all property to which the ideal lien creditor could have attached. Upon the exchange of the

---

purchaser without knowledge of the commencement of the case and for less than present fair equivalent value has a lien on the property transferred to the extent of any *present value given*, unless a copy or notice of the petition was so filed before such transfer was so perfected.

**115.** We say this upon the assumption that the sale was for *"present fair equivalent value"* as no party has suggested otherwise.

**116.** 11 U.S.C. § 541(a)(7) reads as follows:

### § 541. Property of the estate
(a) The commencement of a case under section 301, 302, or 303 of this title creates an estate. Such estate is comprised of all the following property, wherever located and by whomever held:

. . .
(7) Any interest in property that the estate acquires after commencement of the case.

**117.** Our analysis of trust law is that such probably did not happen; therefore, if the bankruptcy trustee wanted to be involved in extensive litigation over the first sale, under Louisiana law, he probably could be. The problem here would be that in fact it would be the buyer's action against the trust that would be the focus, due to the warranty claim if title was not properly transferred. We think the trustee was wise not to wander down this path, and wise in the retained focus upon the Tennessee property.

**118.** The author of this opinion lives in Sunshine, Louisiana.

property for the money, as the lien claim had existed upon the property, the ideal lien attached to the money, thereby subordinating both Guillot's and the trust's interest in the purchase price, to that of the trustee. The second sale effects the same result. The lien claim to the money, which primed the defendants' claim to it, perhaps did not follow the money into the hands of the sellers of the Tennessee property (see the limitations of § 549), but it did attach, in preference and priority to the interests of both Guillot and the trust,[119] to the Tennessee property upon the purchase of it by Guillot or the trust (which one did it is irrelevant, as the trust cannot complain about the attachment of the lien, because of the claim of the estate secured by the lien).[120]

Because the ideal lien remains in place, the trustee's interest in the Tennessee property primes that of either Guillot or the trust. Because of the claim of this lawsuit, that the trustee's interest be declared to be superior, it can be.

### THE REMEDY

We think that the interest of the estate in, to, and upon the Tennessee property is superior to that of Guillot and the trust. The recognition of this subordination, because we think the value of the property is less than the claims against this estate, acts to render the subordinate interest without value. The trustee has stated a claim under § 550, seeking the return of the property. We have suggested that § 550, on its face, applies to impose personal liability upon third parties. Was there a transfer here that brings the trustee's lawsuit within the ambit of § 550?

We think that it is not necessary to invoke § 550 as part of the remedy for the declaration made herein. We have declared that the attempt to "wash" the Louisiana residence free of the effect of the § 544(a) lien, by means of changing the immovable property to money and the money into another piece of immovable property purportedly owned by the trust, was unsuccessful, in the circumstances making up the facts found in this proceeding. The lien remains. There was no pre-petition transfer that required avoidance; that is the effect of our holding on the sham nature of the donation. There was, because of the peculiar nature of the attempt to launder, in fact no post-petition transfer that required avoidance, for the trustee to lay claim to a priority claim upon the Tennessee property.[121] We conclude that the creation of the ideal lien creditor status, by federal law, carries with it creation of the remedy. The estate's interest, by virtue of the lien status, requires that upon declaration of the priority and effect of the ideal lien, the subordinate entity retain no claim to the property unless and until the entirety of the estate claim aggregate is satisfied.[122] The federally created ideal lien includes, in its ideal

119. Assuming the trust, which acted through the improperly designated successor trustee, obtained an interest, which we do here, only for the sake of argument.

120. The bankruptcy trustee has suggested the possibility that § 541(a)(6) brings the Tennessee property into the bankruptcy estate because the property should be seen as "proceeds, product, offspring, rent or profits of or from property of the estate ...," particularly proceeds or profits. However, recall that the trust is the record owner of the Tennessee property, so there must be a legal basis upon which to subordinate the interest of the trust. The § 544(a) lien gives us this subordination tool. Section 541(a)(6) does not.

121. We do not make that statement for any purpose except resolution of this proceeding. The trustee has alluded to the transfer of some $10,000 to Guillot's wife from the Louisiana sale proceeds, and has reserved action against her. We do not attempt to reach any question except that directly before us.

122. Professor Carlson is interested in establishing the right of the subordinate entity to any surplus, in situations where the party is not the debtor, and the debtor, pre-bankruptcy, would have had no claim to the property. See, Carlson, pp. 563, et seq. As we have mentioned, we do not have to deal with this question here. What we are concerned with is the avenue by which the trustee can enforce the ideal lien.

character, the remedy. The federal subordination of the non-estate property interest effects a preemptive subordination. Once the priority of the trustee's lien claim under § 544(a) is adjudged, the adjudication acts to formalize the subordination, rendering the third party's claim (at best), one to make a claim for the residual interest in the property after its administration by the trustee. The easy way to see it would be to call the adjudication an avoidance of whatever interest there is, on the basis that there must have been a pre-existing transfer that generated the interest (maybe so, but not one that can be asserted against the ideal lien creditor—the status just wins), and therefore to apply § 550 to require "return" of the property.

Our more (technically) difficult, but we think more (technically) correct approach is to deem the adjudication and subordination to be the enforcement of the ideal lien, so that all that is left is ministerial matters such as the clearing of record title, etc., if anything.

The creation of the ideal lien status acts to create the enforcement mechanism. Necessary to the efficient administration of the bankruptcy estate is the equitable power to order the situation whereby the trustee's lien status is merged with an enforcement action so that the lien status, once declared (in accordance with the Code), can reach simultaneous fruition. The ideal lien creditor, simply put, has been given a federal pass by which it can skip applicable non-bankruptcy law procedural enforcement mechanisms that would otherwise bind our ideal lien creditor. There is no such thing, absent bankruptcy, as the ideal lien creditor. For the ideal lien creditor to function as such, this Court must have the authority (arising from its constructive possession of the res, including the property interests represented by the ideal lien status) to order that the lien

status, once recognized, be immediately (or even within the act of declaration) merged into estate ownership of (or capacity to administer) the property to which the lien was affixed as of commencement of the case.

The subordination inherent in the declaration then is actualized. We leave for another day the question of the residual interest of the subordinated party. We note that if that party is the holder of an unperfected lien, the unperfected lien is of no use, since as an unsecured creditor (a creditor represented by the trustee), the (blemished lien) creditor would be paid in full before it would be able to assert its residual (unperfected) lien (therefore, the lien would be gone). Further, we can avoid the question, because it is not germane to this proceeding (given the apparent disparity between the value of the Tennessee property and the aggregate amount of bankruptcy claims).

The trustee is entitled, upon these reasons, to an order declaring that pursuant to § 544(a), the trustee's lien creditor status primes the interest of both Guillot and the trusts in, to, and upon the Tennessee property, and therefore the Tennessee property, by virtue of the declaration, is property of the bankruptcy estate. The order shall be self-activating, and shall require no action whatsoever, on the part of either Guillot or the trust.[123]

■ Further, the Court deems it necessary to issue a permanent injunction, in form and substance similar to the consent preliminary injunction. The injunction need not extend to post-judgment remedies (such as eviction, etc.), because issuance of the judgment upon these reasons will eradicate any interest in the property on the part of any party other than the bankruptcy estate, save only the right (though probably it will not exist) to assert a claim to or to appear post-administration

123. We do not think it necessary and, as well, do not think it appropriate to instruct a purported trust to act through a trustee that the

Court does not think was a properly appointed trustee. From Guillot, the Court needs nothing.

in connection with any surplus after any and all amounts are paid or accounted for in connection with estate administration, by means of the final distribution provisions of § 726(a)(1)–(5). The permanent injunction will, however, forbid the defendants, their assigns, etc. from taking any action in connection with the Tennessee property which conflicts or interferes with the interest of the bankruptcy estate, as established hereby.

A separate judgment shall issue.